UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

CARTER RESERVOIR MUSTANGS, INC., et al.,

                    Plaintiffs,

        v.

UNITED STATES DEPARTMENT OF INTERIOR, et al.,

                    Defendants.

No. 2:25-cv-3252 WBS DMC

MEMORANDUM AND ORDER RE: MOTION FOR PRELIMINARY INJUNCTION

----oo0oo----

        This case involves claims brought pursuant to several federal statutes challenging Bureau of Land Management ("BLM") decisions regarding the relocation of wild horses. (See First Am. Compl. ("FAC") (Docket No. 12).)  Plaintiffs now move for preliminary injunctive relief on the ten claims they raise in the FAC.  (Docket No. 22.)  Specifically, they seek to temporarily halt a scheduled removal of so-called excess wild horses in Northeastern California.  (Id. at 10.)

1

I.   Background

Plaintiffs primarily challenge BLM's 2025 Gather Plan and its scheduled execution.  The 2025 Gather Plan authorizes the "gather and removal" of wild horses in three locations, called Herd Management Areas ("HMAs"):  the Carter Reservoir HMA, the Buckhorn HMA, and the Coppersmith HMA.[1]  (FAC at 24.)  BLM arrived at this plan by relying upon "Appropriate Management Levels" ("AMLs") for wild horses.  (Id.)  An AML is the population of wild horses that a given area of land can sustain. (Id.)  The relied-upon AMLs have their own histories:  They were "set, modified, or reaffirmed" through the "1981 Cowhead/Massacre Land Use Plan MFP,[2] 1985/1989 Carter Reservoir HMA Herd Management Area Plan, 2003 Carter Reservoir AML Establishment/Capture Plan, . . . 2008 Surprise Resource Management Plan," the 1984 Coppersmith Herd Management Area Plan, and the 1984 Buckhorn Herd Management Area Plan, many of which plaintiffs also challenge.  (Id. at 24–25, 31–32.)

a.   The Carter Reservoir HMA

The Cowhead/Massacre Land Use Plan, which BLM adopted in 1981, addressed 769,000 acres of public land and established the Carter Reservoir HMA.  (Id. at 25–26.)  In establishing the Carter Reservoir HMA as part of this plan, BLM stated that

---

[1]   The FAC contains a veritable herd of acronyms scattered throughout its body.  The court – which is not a subject-matter expert in agency action regarding the management of wild horses -- finds these acronyms challenging to wrangle.

[2]   An "MFP" is defined in the instant motion as a Management Framework Plan.  (Docket No. 22 at 11.)

2

"40,000 acres would be provided for a total population of 20 to 30 horses," with 300 Animal Unit Months ("AUMs") of forage.  (Id. at 26.)  An AUM is defined by BLM as "the amount of forage necessary to sustain one adult horse . . . for one month."  (Id. at 12.)  Plaintiffs allege that the AML of 20 to 30 horses was "not based on evidence, analysis or appropriate studies" and "improperly limited" to the "geographic area" of 40,000 acres.  (Id.)  They further allege that, in selecting the boundaries for the Carter Reservoir HMA, BLM failed to "take into account water resources needed to sustain a viable horse population."  (Id. at 27.)

In 1985, BLM adopted a HMAP for the Carter Reservoir HMA, specifically.  (Id.)  Pursuant to this plan, BLM reduced the acreage of the Carter Reservoir HMA from 40,000 to 23,200 "without any analysis, rationale, or discussion."  (Id.)  BLM did not, however, alter its 1981 AML of 20 to 30 horses in its 1985 HMAP.  (Id.)  Nor did it explain why.  (See id. at 27—28.)

BLM revised some provisions of the Carter Reservoir HMAP in 1989 but did not modify the Carter Reservoir HMA's boundaries or AML.  (Id. at 28.)  In 2003, BLM adopted the "Carter Reservoir AML Establishment/Capture Plan," which increased the AML for the Carter Reservoir HMA from 20 to 30 wild horses to 25 to 35 wild horses.  (Id.)  Plaintiffs allege that, in arriving at this increased AML in 2003, BLM failed to "consider habitat suitability," namely, the lack of available vegetation and water for the wild horses during the winter months.  (See id. at 28—29.)

3

Five years later, BLM adopted the 2008 Surprise Resource Management Plan.  (Id. at 30.)  This plan did not alter the 2003 AML for wild horses in the Carter Reservoir HMA, nor did it analyze whether the Carter Reservoir was a suitable habitat for wild horses, and, if not, whether the HMA should have been enlarged or altered.  (See id.)

b.    The Coppersmith and Buckhorn HMAs

In 1979, BLM adopted the Tuledad/Home Camp Management Framework Plan, which established an AML of 80 to 100 horses for the Tuledad HMA.  (Id. at 30.)  BLM established this AML by, among other things, considering available land and forage.  (See id.)

Four years later, the Tuledad HMA was divided into the Coppersmith HMA and Buckhorn HMA.  (Id.)  After meeting with interested individuals, BLM and those individuals informally agreed that an AML of 50 to 75 horses would be appropriate for the Coppersmith HMA and the Buckhorn HMA, each.  (See id.)

In 1984, BLM adopted a HMAP for the Coppersmith HMA that affirmed, but did not re-evaluate, the AML of 50 to 75 horses informally agreed to the previous year.  (See id. at 31) BLM did the same in creating a HMAP for the Buckhorn HMA.  (See id.)

c.    The 2025 Gather Plan

Last year, BLM adopted the Carter Reservoir, Buckhorn, and Coppersmith Wild Horse Gather and Population Control Plan, known as the 2025 Gather Plan.  (Id.)  The 2025 Gather Plan

provides for the "gather and removal of" hundreds of "excess wild horses" in the previously-described HMAs.  (See id. at 24.)

According to plaintiffs, this plan did not involve the adjustment or re-calculation of the above-described AMLs.  (See id. at 32.)  Rather, the 2025 Gather Plan contained a "determination that an overpopulation [of wild horses] exists in the Carter Reservoir, Buckhorn, and Coppersmith HMAs," the corresponding AMLs for which plaintiffs allege were "not based on appropriate evidence, studies, and analysis; and/or were based on acreage different from that addressed in earlier land use plans and decisions."  (Id.)  Plaintiffs then detail the further, allegedly deficient actions BLM took (or did not take) in adopting the 2025 Gather Plan.  (See id. at 32–33.)

d.   Executing the 2025 Gather Plan

On March 13, 2026, BLM solidifed its plans to operationalize the 2025 Gather Plan.  (See Docket No. 22 at 25.)  Specifically, BLM aims to gather and remove 470 wild horses from the Carter Reservoir HMA, 273 wild horses from the Buckhorn HMA, and 113 wild horses from the Coppersmith HMA.  (Id.)  These gathers, which the court will refer to as the September 2026 Gathers, are currently scheduled to be executed between September 1, 2026, and September 30, 2026.  (Id.)

Plaintiffs seek to preliminarily enjoin the September 2026 Gathers on the grounds that they violate the Wild Free-Roaming Horses and Burros Act (WHA), 16 U.S.C. § 1332, et seq.; the Federal Land Policy and Management Act (FLMPA), 43 U.S.C. § 1701 et seq.; the National Environmental Policy Act (NEPA), 42

U.S.C. § 4321 *et seq.;* and the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq.* (Docket No. 22 at 2.)   Defendants oppose plaintiffs' motion.   (Docket No. 32.)

II.   The Plaintiffs

Plaintiffs consist of (1) a nonprofit, Carter Reservoir Mustangs, Inc. ("CRMI"), (2) CRMI's president and founder Darice Massey, (3) another nonprofit, Wild Horse Education ("WHE"), (4) WHE's president and founder Laura Leigh, and (5) Billo Michael Comola.   (See FAC at 2—6.)[3]

Carter Reservoir Mustangs, Inc., founded in 2015, serves to "educate[] and inform[] the public about the wild horses and burros in the Carter Reservoir Herd Management Area," through various media.   (Id. at 2—3.)   Its "mission is to provide effective means for conserving the irreplaceable Carter Reservoir Spanish-Iberian Mustangs for generations to come," which it executes by, among other things, conducting research regarding these animals, developing a conservation center to house and care for them, and educating the public regarding their importance. (Id. at 3.)   Members and volunteers of CRMI routinely visit the Carter Reservoir HMA to "view, study, and document the Carter Mustangs," and intend to continue doing so for the "foreseeable future on no less than an annual basis."   (Id.)

Massey adopted her first Carter Mustang in May 2004 and has since "owned, trained, or worked with at least an additional eight" such Mustangs.   (Id.)   Since 2012, she has visited the

---

[3]   The court refers to Massey, Leigh, and Comola as the "individual plaintiffs," and CRMI and WHE as the "organizational plaintiffs."

Carter Reservoir HMA "approximately four to six times per year" to observe the wild Carter Mustangs; she plans to continue her visits at the same frequency for the foreseeable future. (Id.) Indeed, because of her frequent visits, she "knows the wild Mustangs in the . . . Reservoir . . . intimately by name" and has "developed a strong bond with" them. (Id. at 4.) She has communicated the importance of protecting these horses to BLM individually and through her organization, CRMI. (See id.)

Wild Horse Education, as its name suggests, is "dedicated to research, journalism, and public education concerning the activities and operations of federal and state management of the free roaming horse and wild burro populations." (Id.) Like CRMI, its mission is to "protect and preserve wild horses and burros" through "public education," engagement with BLM, and other means. (Id.) Since WHE's inception in 2011, WHE's "members and supporters" have visited the locations at which BLM plans to relocate wild horses to "view, photograph, and document the wild horses" there. (Id. at 5.) These individuals have accordingly "developed strong emotional connections with the wild horses" they have observed. (Id.)

Leigh has been visiting the wild horses at issue for approximately fifteen years and plans to continue visiting them for the foreseeable future. (Id.) Like Massey, she has also communicated the importance of protecting the wild Carter Mustangs to BLM both individually and through her organization, WHE. (Id.)

7

Comola "routinely visits the Carter wild horses" in the Carter Reservoir HMA and has "done so for many years." (Id.) He "gains great satisfaction from seeing the horses and other animals living peacefully in their natural environment." (Id.) He also purchased a property near the Mustangs, which he began renting to individuals who sought to view those Mustangs in 2023. (Id.) He alleges that, if BLM is permitted to relocate the Mustangs, his "ability to rent" his property "will . . . be negatively impacted." (Id. at 6.) He has expressed his opposition to the 2025 Gather Plan to BLM directly. (Id.)

III. Preliminary Injunction

A preliminary injunction is an "extraordinary and drastic remedy" that should not be granted "unless the movant, by a clear showing, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (per curiam) (emphasis in original). Thus, plaintiffs, as the party "seeking a preliminary injunction," must "establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). The last two factors "merge when the Government is the opposing party." Nken v. Holder, 556 U.S. 418, 435 (2009).

"[A]s a threshold matter, [p]laintiff[s] must have standing to sue." Rosenblum v. Does 1-10, 474 F. Supp. 3d 1128, 1132 (D. Or. 2020). The court addresses this "threshold

8

jurisdictional [issue]" first.  See Pirozzi v. Apple, Inc., 966 F. Supp. 2d 909, 917 (N.D. Cal. 2013).

IV.   Article III Standing

"To establish constitutional standing, plaintiffs must demonstrate three elements":  (1) an injury-in-fact that is "concrete and particularized" and "actual or imminent"; (2) a causal connection, meaning the injury must be "fairly traceable" to the "conduct complained of," and (3) redressability, meaning that a "favorable decision" would be "likely to redress the injury-in-fact."  Barnum Timber Co. v. U.S. E.P.A., 633 F.3d 894, 897 (9th Cir. 2011) (citation modified).  Plaintiffs must "demonstrate standing for each claim [they] seek[] to press." DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 352 (2006).

a.   Counts Nine and Ten

In Counts Nine and Ten of the FAC, plaintiffs allege that the 2025 Gather Plan, which BLM seeks to operationalize via the currently planned September 2026 Gathers, is unlawful under the WHA, NEPA, and APA.  (See FAC at 43—45.)  Plaintiffs have standing to do so.

It is well-established that "the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing."  Lujan v. Defs. of Wildlife, 504 U.S. 555, 562-63 (1992); see also In Def. of Animals v. U.S. Dep't of Interior, 808 F. Supp. 2d 1254, 1262 (E.D. Cal. 2011) (England, J.) (finding that "diminished ability to interact with, view and enjoy wild horses and burros" constituted Article III injury).  Each of the individual

9

plaintiffs plainly alleges a desire to observe and document the Carter Mustangs that would be trampled upon by the execution of the 2025 Gather Plan.  (See FAC at 3—4 (Massey), 5 (Leigh and Comola), 6 (Massey, Leigh, and Comola).)  Unlike the plaintiffs in Lujan v. Defs. of Wildlife, the individual plaintiffs here concretely assert that they plan to observe the Carter Mustangs in the future.  See 504 U.S. at 563—64.

For years, Massey has been visiting, and will continue to visit, the Carter Reservoir HMA approximately four to six times per year to observe and document the Carter Mustangs.  (See FAC at 3.)  Leigh, likewise, has been visiting the Carter Reservoir HMA for years to observe and document the Carter Mustangs, with her last visit in 2025; she states that she plans to continue her regular visits for the foreseeable future. (Docket No. 16-3 at 2.)  And Comola, who lives in Surprise Valley, also routinely visits the nearby Carter Reservoir HMA to observe the Carter Mustangs and has done so for many years; he, too, plans to continue his regular visits for the foreseeable future.  (Docket No. 16-2 at 2.)

Moreover, Comola states that he owns a property in "proximity to" the Carter Mustangs, and that "[p]ast and current tenants" have rented this property to "view" those Mustangs. (Docket No. 12 at 5—6.)  He claims that, if a large number of these Mustangs were to be relocated, his "ability to rent this . . . property" would be "negatively impacted."  (Id.)  Comola's alleged, economic injury -- a potential loss of rental income --

is a "quintessential injury-in-fact." Maya v. Centex Corp., 658 F.3d 1060, 1069 (9th Cir. 2011).

As for CRMI and WHE, they have associational standing based on their members' individual standing. "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc., 517 U.S. 544, 553 (1996) (citation omitted). As discussed above, the organizational plaintiffs' members, here Massey and Leigh, have standing to sue in their own right. See id. Next, the "interests" the organizational plaintiffs "seek[] to protect" -- the observable presence and well-being of Carter Mustangs -- overlap almost entirely with their stated "purpose[s]." See id. Finally, plaintiffs seek purely injunctive relief in the form of enjoining the implementation of and vacating the 2025 Gather Plan (FAC at 45—46, see Docket No. 22), the grant of which would not require the participation of CRMI and WHE's individual members in this lawsuit. See Warth v. Seldin, 422 U.S. 490, 515 (1975).

Plaintiffs' alleged injuries are also "fairly traceable" to defendants' "conduct," namely, the adoption of the 2025 Gather Plan and its planned execution via the September 2026 Gathers. See Barnum Timber Co., 633 F. 3d at 897. Indeed, it is apparent that a diminished ability to observe and document the

11

Carter Mustangs would result from a plan that expressly provides for the relocation of those same Mustangs.  And plaintiffs have satisfied the "redressability" element of standing because a "favorable decision" of this court temporarily enjoining the implementation of the 2025 Gather Plan (and the relocation of Carter Mustangs therein provided for via the September 2026 Gathers) would obviate their aesthetic injuries.  See id.

b.    The Remaining Claims (Counts One through Eight)

In Counts One through Eight, plaintiffs challenge the 1981 Cowhead/Massacre Land Use Plan, the 1985/1989 Carter Reservoir HMA HMAP, the 2003 Carter Reservoir AML Establishment/Capture Plan, and the 2008 Surprise Resource Management Plan (the "intermediate plans").  (See generally FAC.) Their theory for now seeking to vacate and set aside these decades-old agency actions, separately and independently from any challenge to the 2025 Gather Plan, proceeds as follows:  BLM, as part of these plans, unlawfully adopted AMLs that it subsequently modified or affirmed, without proper re-evaluation, in the 2025 Gather Plan.  (See id.; see also Docket Nos. 16 at 34; 33 at 14—16.)  As such, plaintiffs claim, "setting aside" the intermediate plans will "redress" their aesthetic injuries by "obligat[ing] BLM to set an AML range" that comports with governing statutory requirements.  (See Docket Nos. 16 at 34, 33 at 16.)

To the extent that the intermediate plans relate to the 2025 Gather Plan, plaintiffs may attack the intermediate plans as components of their claims challenging the 2025 Gather Plan.  But vacating the intermediate plans on a standalone basis, divorced

12

from their relation to the 2025 Gather Plan and its scheduled implementation, would not redress plaintiffs' instant, aesthetic injury.  See Barnum Timber Co., 633 F. 3d at 897.  Accordingly, the court proceeds to address the Winter factors as they apply to plaintiffs' claims which mount challenges to the 2025 Gather Plan and its planned execution.

V.    Preliminary Injunction Factors

    a.    Likelihood of Success on the Merits

    Likelihood of success on the merits is "the most important factor in determining whether a preliminary injunction is warranted."  Garcia v. County of Alameda, 150 F. 4th 1224, 1230 (9th Cir. 2025) (internal citations and quotation marks omitted).

    When assessing the merits of plaintiffs' claims, "[b]ecause neither NEPA nor the [WHA] contain an internal standard of judicial review, the [APA] governs this court's review of the BLM's actions."  In Def. of Animals, Dreamcatcher Wild Horse & Burro Sanctuary v. U.S. Dep't of Interior, 751 F.3d 1054, 1061 (9th Cir. 2014).  The APA requires courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

    To comply with the arbitrary and capricious standard, BLM "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut.

Auto. Ins. Co., 463 U.S. 29, 43 (1983).  "An 'agency's action must be upheld, if at all, on the basis articulated by the agency itself.'"  Butte Cnty., Cal. v. Hogen, 613 F.3d 190, 196 (D.C. Cir. 2010) (quoting State Farm, 463 U.S. at 50).

           i.    WHA and APA

In their ninth claim, plaintiffs argue that the 2025 Gather Plan violates the WHA and APA because, among other things, defendants based their "overpopulation determination on incorrect assumption [sic] and arbitrarily relying on AMLs that the agency knew were set only for administrative reasons and not on appropriate evidence, studies, and analysis."  (Docket No. 22 at 38.)

"Because of Congress' concern that wild horses were vanishing from the West, it passed the WHA to protect wild horses from 'capture, branding, harassment, or death' and ordered that the horses were to be considered 'an integral part of the natural system of the public lands.'"  Kathrens v. Zinke, 323 F. Supp. 3d 1142, 1149 (D. Mont. 2018) (quoting 16 U.S.C. § 1331). Accordingly, the WHA directs BLM to manage wild horses "in a manner that is designed to achieve and maintain a thriving natural ecological balance on public lands."  16 U.S.C. §§ 1332(a), 1333(a).

The WHA "does not define 'appropriate management level,' instead authorizing BLM to 'determine' both the AMLs and how they should be achieved."  Colorado Wild Horse v. Jewell, 130 F. Supp. 205, 213 (D.D.C. 2015) (quoting 16 U.S.C. § 1333(b)(1)). But the WHA does instruct BLM to "'maintain a current inventory'

of wild horses in order to determine" those AMLs.  Id. at 211 (quoting 16 U.S.C. § 1333(b)(1)).  The WHA's inventory requirement exists because "inventory is designed to help BLM decide 'whether and where an overpopulation exists' and whether to achieve AMLs by removing 'excess animals' or by taking some other action."  Id. (quoting 16 U.S.C. § 1333(b)(1)).

Plaintiffs chiefly contend that defendants' overpopulation determination was based on incorrect assumptions because BLM relied upon an unsupported "20% annual growth rate" to estimate the "current population" of wild horses in the HMAs at issue.  See 16 U.S.C. § 1333(b)(1) (directing BLM to "maintain a current inventory" of wild horses); Docket No. 22 at 41.  However, based on data provided within BLM's own 2025 Gather Plan's Environmental Assessment (EA), the growth rates of horses in the HMAs at issue have, over the past fifteen years, departed significantly from BLM's assumed 20% growth rate and in many years have in fact been negative.  (See Docket Nos. 26-3 (2025 Gather Plan EA) at 6—9, 22 at 41—42.)

Defendants do not address this discrepancy in assumed and actual growth rates in their opposition or the exhibits attached thereto.  Defendants point to a 2013 study referred to in the 2025 Gather Plan EA (the "EA") in purported support of their position; this study "concluded that wild horse populations grow at 15-20% a year."  (EA at 171.)  While the study may have reached that conclusion, the 270-page EA fails to address (1) the actual population growth in the subject areas, and (2) given the discrepancy between the growth rate cited in the study and the

15

actual growth rates, why reliance on the 2013 study is appropriate here.

Courts are prohibited from "automatically defer[ring] to an agency's conclusions, even when those conclusions are scientific," so as to avoid "render[ing] judicial review generally meaningless." San Luis & Delta-Mendota Water Auth. v. Locke, 776 F.3d 971, 994 (9th Cir. 2014).  This court's role in "ensur[ing] that agency decisions are founded on a reasoned evaluation of the relevant factors," id. at 995, is especially relevant here, where BLM's assumed growth rate "runs counter to the evidence before" it, State Farm, 463 U.S. at 43, namely, the actual population growth rates of the Carter Reservoir Mustangs in the HMAs at issue.  Cf. Nat'l Wildlife Fed'n v. E.P.A., 286 F.3d 554, 565 (D.C. Cir. 2002) (courts may "reject an agency's choice of a scientific model . . . when the model bears no rational relationship to the characteristics of the data to which it is applied").

Because BLM has failed to consider the actual growth rates of the horse populations at issue, the court must conclude that BLM has acted arbitrarily and capriciously in violation of the APA, 5 U.S.C. § 706(2)(A).  See Sault Ste. Marie Tribe of Chippewa Indians v. Haaland, 659 F. Supp. 3d 33, 48 (D.D.C. 2023), aff'd, No. 23-5076, 2024 WL 3219481 (D.C. Cir. June 28, 2024) ("An agency acts arbitrarily under § 706(2)(A) of the APA when it refuses to consider evidence bearing on the issue before it or ignores evidence contradicting its position." (citation modified)).  That being the case, the court concludes that based

16

on the present record plaintiffs are likely to succeed on the merits of their WHA claim.  See 16 U.S.C. § 1333(b)(1).[4]

    b.   Irreparable Harm

"Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.,* irreparable.  If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." Amoco Prod. Co. v. Vill. of Gambell, AK, 480 U.S. 531, 545 (1987); see also Battelle Energy All., LLC v. Southfork Sec., Inc., 980 F. Supp. 2d 1211, 1220 (D. Idaho 2013) ("Harm is irreparable when, as name suggests, the harm cannot be undone by an award of compensatory damages.").  While the Supreme Court's language in Amoco "does not mean that any potential environmental injury warrants an injunction," "actual and irreparable injury" is sufficient to satisfy Winter's requirement of irreparable harm.  All. for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1135 (9th Cir. 2011).

Plaintiffs offer two grounds for finding irreparable harm: (1) their aesthetic interests will be significantly impaired if BLM is permitted to proceed with the September 2026 Gathers; and (2) the September 2026 Gathers "will result in a significant loss to the wild horse population numerically" and "threaten[] the herds' very existence due to genetic

---

[4]   As plaintiffs are likely to succeed on the merits of their WHA claim, the court need not consider whether they are also likely to succeed on the merits of their NEPA claim.  See Los Angeles Press Club v. Noem, 171 F.4th 1179, 1189 (9th Cir. 2026).

17

bottlenecking and associated impact to the [horses'] genetic diversity."  (Id.)

As discussed above, plaintiffs "enjoy observing, photographing and generally commiserating with the [horses]" at the various HMAs.  Fund For Animals v. Clark, 27 F. Supp. 2d 8, 14 (D.D.C. 1998).  Thus, it is not unreasonable for them to claim that dramatically "reduc[ing]" the number of horses in those areas "would have an appreciable and irreparable harm on [their] interests."  Fund For Animals v. Norton, 281 F. Supp. 2d 209, 221 (D.D.C. 2003) (discussing Clark, 27 F. Supp. 2d at 14—15).

While defendants argue that Clark and Norton are distinguishable because the operations contemplated in those cases involved the killing of animals (Docket No. 32 at 63—64), the findings of irreparable harm reached in those cases did not turn exclusively on that fact.[5]  See Clark, 27 F. Supp. 2d at 14 ("even contemplating" treatment of bison in controlled hunt sufficient to establish irreparable harm); Norton, 281 F. Supp. 2d at 221 ("even the contemplation" of mistreatment of bison in planned removal operation sufficient to establish irreparable harm (emphasis in original)).  The court declines to announce a requirement that irreparable harm to a plaintiff's aesthetic interest in animals' presence can exist only when the killing of

_____

[5]   Moreover, it is reasonable to assume that at least some horses will end up being killed or seriously injured as a result of the September 2026 Gathers.  (See 2025 Gather Plan EA at 55—56 (risks of gather include, but are not limited to, fatalities, "bruises, scrapes, or cuts," "spinal injuries or fractured limbs," and "miscarriages" in up to "5% of . . . captured mares").)

18

those animals is expressly contemplated.  Cf. Clark, 27 F. Supp. 2d at 14; Norton, 281 F. Supp. 2d at 221.

Plaintiffs' injuries are "not compensable in money damages because, while the injury threatened to . . . plaintiffs' aesthetic interests would be palpable and concrete, they are not ownership interests in property susceptible to monetary valuation."  Fund for Animals, Inc. v. Espy, 814 F. Supp. 142, 151 (D.D.C. 1993).  Accordingly, plaintiffs have established irreparable harm.  See Battelle Energy All., LLC, 980 F. Supp. 2d at 1220.

c.    Balance of Equities and the Public Interest

"The public interest favors injunctions against unlawful agency practices, and agencies have no countervailing interest in perpetuating those practices."  League of United Latin Am. Citizens v. Exec. Off. of the President ("LULAC"), 780 F. Supp. 3d 135, 211 (D.D.C. 2025); see also Cath. Legal Immigr. Network, Inc. v. Exec. Off. for Immigr. Rev., 513 F. Supp. 3d 154, 176 (D.D.C. 2021) (same).  That is the case here, where, as explained above, the proposed September 2026 Gathers likely violate the WHA and APA.

Defendants argue that preliminarily enjoining the September 2026 Gathers could result in, among other things, the horses residing in the HMAs at issue being exposed to drought conditions, and land and resource quality within the HMAs declining due to "extensive trampling and trailing damage done by the overpopulation of wild horses."  (Docket No. 32 at 67—68.) On the other hand, the public has an interest in "the meticulous

19

compliance with the law by public officials," Clark, 27 F. Supp. at 15 (quotations omitted), that cannot be overcome by BLM's post-hoc rationalizations, see LULAC, 780 F. Supp. 3d at 211. The sooner BLM comes into "compliance," Clark, 27 F. Supp. at 15, with the WHA and other applicable statutes, the sooner it will be able to execute its planned gather.

Accordingly, the court concludes that the balance of equities and public interest weigh in favor of granting plaintiffs' requested injunctive relief.

VI.   Conclusion

Because plaintiffs have demonstrated a likelihood of success on the merits of their WHA and APA claim, that they will likely suffer irreparable harm absent preliminary relief, and that the balance of equities and public interest favor granting injunctive relief, the court will grant plaintiffs' motion for preliminary injunction.  See Winter, 555 U.S. at 20.

IT IS THEREFORE ORDERED that, plaintiffs' motion for preliminary injunction (Docket No. 22) be, and the same hereby is, GRANTED.  Pending further proceedings in this case, defendants are hereby ENJOINED from implementing the 2025 Gather Plan to remove horses in the Carter Reservoir, Buckhorn, and Coppersmith Herd Management Areas.

Dated:  July 7, 2026

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE

20